The docket is 5-18-4582, and it's Next Energy v. Dept. of Natural Resources. Ready to proceed? We are, Your Honor. May it please the Court, Counsel. My name is Lane Harvey. I'm counsel for the appellant. I have with me my co-counsel, Mr. Rodney Taylor. The facts of this case are that the plaintiff, the appellant, had obtained oil and gas leases, which we've described in our complaint, between the years of 2009-2012. As is alleged in paragraph 10 of the complaint, the leases were such that they could only be produced on a practical basis by horizontal drilling and fracturing. The State had imposed a moratorium, starting in about 2012 or so, on permits for horizontal drilling and fracking, in that it had refused to pass on applications for permits prior to that time. That was prior to the enactment of the current law. The current law regarding horizontal drilling and fracking was Public Act 9822. It was enacted in June of 2013. However, the regulations pursuant to which that act would be enforced were not adopted until November of 2014. So as a practical matter, there was no way to have applied for a permit in the interim because there was no process in place to do it. In the interim, excuse me, the complaint asserts in paragraph 15 that the application process that was put in place by this statute and by the regulations was effectively futile, and we assert specifically the reasons why in paragraphs A through F. In paragraph 16, we assert that there were specific regulations which were adopted which exceeded the statutory authority, and we assert that because of these circumstances, the application for a permit on the part of the plaintiff in this case would have been futile. In this case, prior to the ruling on the motion for judgment on the pleadings, there had been a motion to dismiss pursuant to section 2-619, which had been denied by the trial court. The state then filed a motion for judgment on the pleadings, which was granted, and it is pursuant to that order that we're here. Now, one of the things that I submit to the court that is significant in this case is the procedural status of why we are here. The procedural status was not based on any kind of an evidentiary hearing, not based on a motion for summary judgment or anything of that sort in which there was evidentiary material presented to the court. The question, the sole question before the court, is did the complaint allege a tribal issue of fact? It was a motion for judgment on the pleadings. The trial court ruled that it did pursuant to the state's motion for judgment on the pleadings. We believe that ruling was error. Now, I think the thing that we should begin discussing a bit is what is exactly the nature of the motion for judgment on the pleadings. The point, and we've cited the authority in our brief, we are required to assume as true the facts that we have alleged in the complaint. And the thing that is significant about the facts that we've alleged in the complaint is prior to the motion for judgment on the pleadings, there had been a motion to dismiss filed by the state which was denied. So that the point is the facts alleged in the complaint were determined by the court to be ultimate facts, and for purposes of the motion for judgment on the pleadings, those ultimate facts had to be considered as true. I would direct the court's attention specifically to paragraph 15 of the complaint. In paragraph 15, we specifically allege that the application for a permit for horizontal drilling and fracking, based upon the circumstances existing by reason of the regulations in the statute, were economically futile and impractical, and we list paragraphs A through F as to the reasons why that's true. I submit to the court that for purposes of this case, the court has to assume the truth of that allegation. And without going through each of the allegations, there's one of particular importance that I think you should take a look at, and that's what's in paragraph 15D. Paragraph 15D alleges that neither the Act nor any regulation related to the Act sets out any definable objective criteria which must be met for granting a permit. Rather, it states that, in submission of the plan, that plans required to be submitted with the application must be adequate and effective. Those terms are not even defined. Such terms are not defined, and there are no standards provided from which it can be determined what is even required for a permit. So at the place where we are, we are at a place where this case is before you on a matter of judgment on the pleadings, under circumstances where we have made very specific allegations as to the futility of the application. Now, my judgment, and I would submit to the court that the question in this case is just this. If the state creates an application process for this permit, which is so honest and so ill-defined, as to in any real sense be impossible on any practical level to meet, must that process be engaged in in order to meet the likeness test? And I submit to you that the trial court's answer that it must is incorrect, and we submit to you that the record establishes that it does not. Now, our position in this case, and we've set this forth at some length in our brief, but our position in this case is that the exception which applies in this case, which allows us to have stated a cause of action, is the futility exception, which we have talked about, and I have referenced a number of cases in the brief, but I would have you take a look at Sherman v. Town of Chester, 752F3561. And it seems to me that the language in that case precisely defines why the trial court erred in entering a judgment on the pleadings, finding that we didn't have standing and that this case wasn't right. What the Sherman court said was the finality requirement is not mechanically applied. A property owner will be excused from obtaining a final decision if pursuing, and this was a zoning case, if pursuing an appeal to the Zoning Board of Appeals or seeking a variance would be futile, referring to the futility exception to the necessity of applying. Then the Sherman court cites the U.S. Supreme Court decision in Palo Alto v. Rhode Island, and we've made reference to that case in the brief. And it says that the government authorities may not burden by imposition of repetitive or unfair land use procedures in order to avoid a final decision. Now, in this case, we had the argument, obviously, before the court, but between the time we filed the complaint in this case and the time we had the argument before the court in this case, there had been one application under the Act. It was the application of the Woolsey Company. We've made reference to that at some length in the brief, and the Woolsey record is part of the record in this case. And the reason it is is the case law makes it very clear that in arguing a motion for judgment on the pleadings, we can argue not only what's in the pleadings, but matters of which the court may take judicial notice. The Woolsey record at the time of the argument in this case was a matter of public record, and we presented it to the court. The Woolsey record is the only application, at least at that time, and I'm not aware that any others have been, but it was the only application submitted under the Act at the time of the argument in this case. My submission is that the Woolsey experience and the Woolsey record demonstrates the futility of the application process. And I simply go through the facts to illustrate my point for you. First, the Woolsey folks applied for a permit. Now, the things that you have to understand is the conditions for application of a permit is in order to register, not to apply, but to register to see if you can apply, you have to present the state with a paid-up $5 million liability insurance policy. Secondly, the cost of application is a non-refundable fee of $13,500. Now, in the Woolsey application, the permit was for a 160-acre tract of ground. The Woolsey folks pay the $13,500 for reasons which are not, frankly, readily apparent on the record. And again, this gets back to the fact that there are no real criteria set forth as to what the application has to do. But for reasons that it's not apparent, the folks at the DNR said, now that application's not good enough, you need to send us another one. So they had to send in another application and another $13,500 because the previous one was not refundable and it didn't count. Then, after review of that, the same thing happened, so that the Woolsey had to submit their third application and their third $13,500. Then there were so-called public comments. Now, if you look at what the Act and the regs say, the public comments are to be submitted by those who will be affected by the issuance of the permit. I simply would ask you to look at the public comments the DNR accepted and imposed on Woolsey, the most notable of which was from some environmental group with offices in New York and Chicago and San Francisco and, of all places, Beijing, China. And they accepted those comments, and among other things, among the other comments they accepted, they directed Mr. Woolsey to respond to those comments. Now, frankly, how those folks were impacted by a 160-acre well site in Wayne County, Illinois, escapes me. But that's what the DNR required. If you look at the other comments that were made, if you look at the other comments that were made. Was Woolsey in Wayne County or White County? I think I have confused that in the brief, Judge. I really believe it was Wayne County, and I think at places I've said White County. But at my age, I get confused. Okay. Well, I wasn't sure. It's a Wayne County lease, and I was looking at it the last couple of days, and I think there were some places where I did confuse that, and I apologize. That's my bad. Okay. But the point that we get to is how that leasehold in southeastern Illinois, in a little county in southeastern Illinois, impacts somebody with an office in Beijing, China. Frankly, it escapes me. If you look at the other complaints that were made, first of all, you see essentially a form letter that was written, and many of them are identical. Several of them were sent. Some of them are not even identified as to who the complainant is. But nevertheless, that's what they did. And the DNR imposed upon Woolsey the obligation to respond to all those things, which led to Woolsey filing the fourth application and the fourth $13,500 fee for a 160-acre well site. So I think if I can multiply correctly, Mr. Woolsey's application fees at this point are up to $54,000 for one well site. Are we talking about stripper wells? No, we're talking about a horizontal. I mean, how much oil is $54,000 would take a lot of oil to justify. Yes, sir, it sure would. It sure would. And the difference, obviously, and I will be the first to tell you that I'm not a petroleum engineer, but what I understand about the horizontal drilling and fracturing is that you can drill a vertical hole and then go horizontally and produce a much larger area with that technology than you could under the older technology of just going down. So I assume, not being a petroleum engineer, but I assume that that is a more effective way, particularly at deeper levels in southern Illinois, a more effective way to produce oil. Because as you gentlemen may know, most of the oil production here is 2,000 to 3,000 feet. And these are substantially deeper, but that, at least as I understand it, is a more economically effective way to produce. And as we've alleged in the complaint with these particular leases, it was the only feasible way economically to produce them. But the difficulty we get to is after we have all of these applications and then all of these comments on Mr. Woolsey's well or permit, and he files the fourth permit application. Was that for four different wells? No, same well, same site, same site. What was their argument as to why they had to pay an application fee every time? I have no idea. Because they said it was nonrefundable. I know that. But that's the point, Judge. It would appear that each of the applications require a separate fee. Because the first application, no, no, we're going to reject that, so that's gone. So if you want it, you have to apply again. So they started over. And it appears to me, from what I've been able to determine from the DNR records, that each of the applications required a separate fee. That's the way they do it. The other thing that should be noted in the course of this, that the application process that DNR engaged in took sufficiently long that Mr. Woolsey had to renew his $5 million liability policy in the middle of it. And so that is a bit of a problem. But here's the end gate, which demonstrates the ultimate futility of this process. After going through all of this material that we went through and all of these applications, for the period of time they were in, I believe it was in the end of August or a little after the end of August, they issued a permit. Now, they didn't issue a permit that said Mr. Woolsey could take his drilling rig out and start to drill. They issued a permit that said you can start to drill when you comply with the 86 conditions we've attached to the permit. Now, at that point, Mr. Woolsey threw up his hands and quit. They attached 86 conditions to the permit that they issued to him. Are those conditions on record? Yes, they're in the record in this case. We submitted them to the trial court when we had the copy of the Woolsey record. Now, the issue in this case, Judge, is have we, between the things that we have alleged and the things of which the court may take judicial notice, which is the Woolsey application process, established the economic futility of the application in this case? And I submit to you that going through all of these things, and this is the only application there has been, you have to conclude that at a minimum, there is a question of fact as to whether the application by Next Energy would have been futile. And the point of the matter is, with that process, and the fact is, to my knowledge, there has been no other application under this statute. We've established the futility, and therefore the rightness of the act is established because of the application process's futility. Thank you. Appellee. Good morning, Your Honor. May it please the court, counsel. Jonathan Sheffield on behalf of the VA Appellee, Illinois Department of Natural Resources. Before I begin, I'd just like to correct something that's in briefing and said by opposing counsel, that this other company, Woolsey, had to pay up to $54,000 to complete a permit. There's nothing in the record that supports that Woolsey had to pay that amount. That's based on a misreading of the Department's regulations. And in this case, the record supports only that they paid $13,500 for the permit fee. The additional fees for additional permits. Would you have an additional permit for another well? Woolsey applied for a single well, and then in its application made an error, which it deemed substantial. And the Department, upon bringing that to Woolsey's attention, then Woolsey corrected that error, but it also waived the period for the Department to make a decision and extended that through the end of August. And by that timeline, the Department granted Woolsey a permit. So we're here asking- How much money exactly did Woolsey pay? Did they have that in the record? That's not in the record as far as I'm aware, Your Honor, because what we do have is available from the Department's website, and that is the permit that was granted to Woolsey and the conditions, and also the materials that were considered along that process of whether to grant the permit. And those materials don't reference a $56,000 figure. That's based on the appellant's misreading of the Department's regulations about existing permit modifications. So after a company gets a permit, they can modify that permit, but there is a fee. It's either $5,000 for an insignificant modification to the permit or $13,000 if it's a significant modification. Were there any of those fees charged to Woolsey? No, because Woolsey applied for a permit, got a permit, but then canceled its permit later. So it never sought to change its permit before it canceled it. So you have no record of the $54,000. Is that correct? Your Honor, that's based on-that comes from the appellant's opening brief and a misunderstanding of the Department's regulations. But the Department never received the funds. Is that what you're saying? No, Your Honor. What I'm saying is that there was-the way that the Department's regulations function, which is the basis for the appellant's argument that Woolsey had to pay this $54,000 figure- You lost me there. Sorry, Your Honor. So the appellant made an argument that this other company had to pay up to $54,000 in order to get a permit because it had to make resubmissions of materials at the Department's request because in Woolsey's initial application, it did not submit enough information to grant a permit. So if you add additional information, it's another $13,500? No, Your Honor. That's the mistake. So did they refund the $13,500? The initial $13,500 was not- No, I'm not talking about that. I'm talking about the correction. There is no fee assessed for corrections to- So you're saying that that is not true? That-Your Honor, I don't think that that's an intentional untruth. I just think that's a misreading of the regulations and an extrapolation from what's in the record. I know, but if you misread an application, do you not get a refund if you overpay? Well, there's no allegation that Woolsey overpaid. The only evidence is that Woolsey paid an initial filing, a filing, $13,500 fee, $13,500, and there's no evidence that they paid anything beyond that. So that's a- But he might have. I'm sorry? You're saying he might have, but there's no record. No, no, no. I'm saying that he did not. There's nothing-I mean, there's no reason to conclude that he paid beyond that because the basis for concluding that he may have paid beyond that is the regulation, but the regulation says that permit modifications, not application modifications, permit modifications. So once you get a permit, to modify that permit, there's a fee. Okay. So he got a permit. Right, and the cost of that was $13,000. And they modified. They didn't modify it. They didn't modify it. Right. So if he paid more than $13,500, then you could get a refund and claim that there was an error? Well, Your Honor, he never- Well, I'm not saying that. Oh, I'm sorry. I'm saying if he did- You know, Your Honor, there's nothing that-right. So if you pay extra money to the State of Illinois, then it's my understanding that the State's not entitled to that and you might get a refund, but there's- I'm sorry, I didn't hear it. You said not entitled to a refund? No, no, Your Honor. There's no reason why the Department would keep money that was given to it in accident. Okay. So, again, we're here talking about when to take his claim as right. And the appellant said that at the motion to dismiss stage, there was a denial of the motion to dismiss, and that's correct, because that-at that stage, the allegation was that this was not a physical invasion of the property and it's-there isn't enough to plead a regulatory takings claim. And generally, there might be enough to plead a regulatory takings claim. But in Illinois, in addition to pleading a takings claim, you also have to plead a right claim. And that means that you must plead that you-and this is under LaSalle Bank. The Illinois Court of Appeals decision in LaSalle Bank says that to plead a right takings claim, a plaintiff must allege that they applied for a decision and seeking-they either received a final decision or that obtaining-continuing would have been futile. And so Next Energy is arguing that even attempting the regulatory process was futile. But no decision of any other court has said that a process may be so unfair and cost so much that attempting it would be futile. In fact, three courts cited in our brief have disagreed with that position because the reason for the futility exception, which is narrow and it is limited to circumstances when, and this is from Palazzolo, the United States Supreme Court's decision in Palazzolo, said that when it is clear that the regulator doesn't have discretion to grant the relief that a party seeks, then it's futile to apply. But there's no allegation that the Department didn't have discretion, so that part of the futility argument is not applicable here. What Next Energy is relying on, Your Honors, is the unfair and repetitive process futility exception. And that exception cannot be applied here because Next Energy never attempted the regulatory process. They cited the decision of Sherman. That's out of the United States Court of Appeals for the Second Circuit. Sherman is distinguishable completely because the plaintiff in Sherman not only attempted the regulatory process there, but the town then several times amended its ordinance after the applications and imposed retroactive moratoria such that 10 years passed in Sherman, and still the plaintiff had not gotten any decision. And so the Second Circuit said that the 10-year process of preventing the plaintiff from ever getting a final decision made it futile to continue with that process. But here we're not asking whether it would have been futile for Next Energy to continue with the process because it never attempted the process. All it had to do, as evidenced from the Woolsey application experience, is apply. And in a timely manner, the department would consider that application and possibly grant a permit, as it did for Woolsey. Now, the appellant has argued that the Woolsey company withdrew its permit because of the conditions placed on it. But that's actually not what the cancellation letter says. Your Honors, the cancellation letter is in the record. The cancellation letter is ‑‑ I don't have it up here with me, but it's attached to the briefing on the motion for judgment on the plaintiffs. And the cancellation letter simply says we're asking to withdraw our permit at this time because there are certain obligations if you have a permit. And it canceled the permit, and then it said if in the future it becomes economical for these projects, we understand we will go through the process of getting a permit again. So that actually refutes an inference that Woolsey decided not to continue on with its operations because of conditions. In fact, Your Honors, those conditions that are attached to the permit, which are in the record, are mostly a reiteration of the standards in the regulation and in the statute and in the industry and also of Woolsey's own detailed plans that it submitted with the application. And so an inference that Woolsey withdrew its permit because of those conditions is entirely unreasonable because there's no surprise. Woolsey knew ahead of time what the conditions would be. What were those conditions, 86 conditions he said? Right, Your Honor. The first conditions deal with where this well site is going to be located. That obviously imposes no additional cost. And other conditions deal with industry standards, Your Honor. And let's be clear. The Illinois statute and regulation here are set to prevent groundwater contamination that can be caused by high-volume horizontal hydraulic fracturing. Let me, I'm not able to quite understand fracturing. Do you see that before you fracture? I'm sorry, what did you say? Do you see a well before you fracture? Your Honor, yes, actually. So the fracturing is a process of finishing the well. So the way it works is a steel casing, a well- What the casing is going to look like? Do they shoot the casing? And then the fracture? And then, right, so you cement it. It's a circulation process. And there are all sorts of industry standards for doing this safely. And those are incorporated into the statute and regulations. And that's essentially what those conditions on Woolsey's permit were. And so fracturing, as you're probably aware, is a process of injecting a propellant, water or other liquid- Would you say water or some kind of sand or something? Right, right. Water with sand to create fractures in the rock to get oil and water to come out. Now what depth is that that you fractured? I'm sorry? You only fracture where you perforate, right? Yeah, right, right. And what distance is, what depth is that usually in Illinois? It may be thousands of feet, Your Honor. It may be less than that. I'm blanking on the moment of the farthest and the shortest distances. But the statute and regulations speak about when those operations occur within certain depths and how close they are to water bodies and drinking water sources and towns. Okay, you're talking about drinking water, except there's fresh water? Right, Your Honor. So that's a concern. Can you talk about what depth is that in Illinois down there? That I'm not familiar with, Your Honor. A couple hundred feet? Maybe at points. And there are about 3,000? I'm not sure, Your Honor, how far drinking water generally is in most parts of Illinois. But the point is that fracturing operations, this isn't a claim that the statute or regulation are unreasonable. This is a claim that the Department and Illinois took the leases that Next Energy purchased. Next Energy purchased five-year leases, which is a very short time to be able to engage in a fracturing operation and recoup your investment. I'm not sure how they expected to do that, Your Honors, but that's what the claim is, is that the state made it impossible or actually took the value of their leases by going through a very typical process of considering regulations for a new type of mining, relatively new. It gained high-volume horizontal hydraulic fracturing. I've got another question. I don't understand this completely. So how big does a zone have to be before you can go horizontal? That didn't win the race? Your Honor, my understanding is I'm not – I don't recall seeing that in the regulation. I did look – I did read the regulations closely. But I – so I don't know if I can answer your question of how deep it has to go before it goes horizontal. I think at least 500 feet. I don't think there's a zone. I'm not that deep. I think it has to be at least – my recollection, actually, is, Your Honor, I apologize, is I think it has to be at least 500 feet down. There is a minimum distance of how far vertically the well must go down before it can go horizontal. But, again, you're not just talking – Is there any regulation as to the depth of the zone? My understanding is that it's a minimum distance and not a maximum. I know that. And I think it's 500 feet, as I recall. I don't – I'm not talking about the depth. I'm talking about the zone itself. I'm not familiar with Your Honor's terminology of the zone. Is that the zone – Where the oil might be. Oh, I see. I see. I don't recall seeing in the statute regulation of where the zone is. But I do think, Your Honor, that – I do want to make sure that we're clear here, that the reason why we're persistent on saying that Next Energy should have applied to the Department is the contours of a regulatory takings claim are defined by the Department's decision on a permit application. Here we don't have a permit application. We don't know the extent of any potential restrictions on a permit that Next Energy might have gotten. We don't know in that circumstance, Your Honor, then – we don't know enough to apply the Penn Central factors that Next Energy is asserting the Court should apply. If this Court were to say that there's a right-takings claim here, it would be impossible to say what value was left in the leases because of the result of a nonexistent permit. Again, the lack of a definition of the restrictions on the land prevent a court from deciding whether a taking has occurred. The Final Decision Department comes from Williamson County. This is an old requirement. I mean, this has been here for – it's well established that it is – until the ordinary processes have been followed, the extent of restriction on the property is not known and a regulatory taking has not been established. The agency's Final Decision informs the constitutional determination, and a takings claim cannot be resolved until the Court knows the extent of the permitted development. Here we don't know the extent of permitted development for Next Energy's leases because it never obtained a permit, which it could have gotten had it applied. That is very clear from the Woolsey experience. And let's also be clear that any concerns about the statute can be brought outside of this action in a different action to challenge the statute as unconstitutional for any other reason. This is just simply a takings claim. And in that, a party has to be able to show that they had some property for some use with some value and that a decision on how they can use that property depleted its property of value. And here we don't have a decision. We don't have something that a court can use. So, for instance, in the case of HODL, the United States Supreme Court case from 1981, it's cited in our brief, Your Honors. Landowners challenged a federal mining law as a taking of their property, but the Court concluded that a claim over application of the statute to a particular surface mining operation or its effects was unright because the plaintiff had not sought relief under the statute. The same is true here, Your Honors. We don't have a right takings claim. If Net Centrgy had applied to fracture its leases, it might have – it could have brought a takings claim that was right, and we could litigate that further. But here we have a judgment on the claims because, again, the standard for judgment on the claims is there's no genuine issue of material fact, and the movement is entitled to judgment as a matter of law. The State here is entitled to judgment as a matter of law because there is no decision. And the narrow and limited futility exception doesn't apply here because the – because Net Centrgy never attempted the process to get a permit. Again, if it had, it could have gotten a permit, Your Honors. And the cost of obtaining a permit is not evidence of futility. That proposition has been refuted by several courts of appeals, and it's been adopted by none because the cost is a different question. Futility concerns the decision-maker and not whether – not the cost of compliance. So in Gautai, a Ninth Circuit decision from the United States Court of Appeals that we cited in our brief, a property owner asserted that the cost of a land use application would necessarily destroy the owner rendering the process futile. But the court said that's not futility in a sense under Williamson County. The owner's financial constraints provide no reason to accept the owner from the obligation to seek a permit. And that decision is in line with Martin from the Federal Circuit and Morris from the Federal Circuit, both cited in our briefs. And there is no reason why an owner who is arguing that the cost of obtaining a permit is prohibitively expensive cannot even attempt that process. And again, $13,500 may seem like a lot to your average person, but these operations are costly and they have a large turnout. And again, the $13,500 also goes to fund the cost of reviewing these applications and monitoring and inspecting and all of these other processes the Department goes through. This process requires some extra care because it can be dangerous if not done correctly, Your Honors. Excuse me. You mentioned industry-wide regulations, and I know that this is a situation where the Federal Government has refrained from issuing uniform standards and states have been pretty much tried with the responsibility of doing the regulations. How does Illinois compare with other states? Are the regulations in Illinois onerous as compared to the regulations that we find in other states that have attempted this process of regulatory putting together rules for practice? Yeah, Your Honor, that's a good question. Unfortunately, I'm only familiar with the state of Illinois' rules. I didn't have the time to give to research and be able to give Your Honor an answer about other states' rules. But even if the states' rules are much more burdensome than other states, that's the kind of claim that you could bring as a challenge to the rationality of the states' rules in a separate action. Again, this is a takings claim, Your Honor, and that's why we ask that this Court affirm the judgment that Next Energy's takings claim is unright because all it had to do was apply, and yet it did not. Thank you, Your Honor. Your Honor? May it please the Court, the place where I want to begin is the gross misstatement of the record that counsel made. Counsel says, oh, my goodness, we had all of these permit modifications when we were doing these claims. There was never a permit modification. What there was was four separate distinct applications, and a permit was only given for the last application. So when he says, oh, there's no charge for a permit application, no permit was issued until the fourth application was filed. So when he tries to tell you that we are somehow in error, he is the one who is in error. And if you look at what we had indicated in our brief, the regulations say that when there is a new application, there is a new $13,500 fee. And if there is an amendment to an old application, there is a $5,000 fee that isn't refunded. So if you assumed for any purpose of discussion that these new applications weren't applications but were amendments, he still paid $28,000. And for counsel to sit here and to say to you that these various applications were somehow or the other permit modifications when he knows that no permit was even issued until the fourth modification, I find a bit remarkable. So that simply is not correct. Now, he then says, well, oh, my goodness, he says, Mr. Woolsey's letter withdrawing his permit didn't say I'm quitting because of the conditions. Your Honor, look at the facts. The facts are Woolsey applied and paid a fee. The facts are Woolsey applied and paid a fee. The facts are Woolsey applied and paid a fee. The facts are Woolsey applied and paid a fee. And then when the permit is issued with 86 conditions attached to it, Woolsey says, well, I can't do it. I can't do it. Now, if counsel is asserting that doesn't at least create a question of fact as to the futility of the application process, then I would be shocked at that. Because the issue in the case where we are now is, is there an issue of fact to be determined based upon evidence as to whether the application process is futile? And you see, the thing that we're talking about here is not what he perceives the regulations to require or whatever. The fact is the application process is administered by DNR. DNR gets to decide, and if you look at what we have alleged, and if you look at the circumstances, there is no objective criteria pursuant to which DNR is compelled to make a decision. They do whatever hits them. That's what's in paragraph 15D of the complaint, which you have to take as truth.  That's what renders, at least in part, the application process futile. The point is, this is, you know, and I guess I'm stuck with the United States Supreme Court, because I don't control the DNR, but the United States Supreme Court tells me that when the application process in this situation is futile, that amounts to a regulatory taking, and that does not, the fact there's no application when the application must be futile, does not mean the case is not right. The sole and only question for you to decide in this case is whether, based on the allegations in the complaint and the facts that we place before the court of which the court took judicial notice of the Wolsey experience, does that create a question of fact as to whether the application process would have been futile? If it does, there's no room for a judgment on the pleadings. We submit to you that it does, and frankly, I've heard nothing from defense counsel which suggests otherwise. So we ask the court simply to reverse the judgment on the pleadings and remand the case to trial so we can put on the evidence that proves it. Thank you. I have a question. Listen. Has Wolsey instituted a cause of action for its experience with the DNR? To my knowledge, he has not judged. I believe Mr. Wolsey has since passed away, actually. So I've – It says, I assume it was a company. Is it his lawyer concerned? Does the company – The company is still in existence, and I have no idea about what they have done. Is there anything that you can glean from the fact that they did not institute or prosecute a cause of action for this grievous conduct that you have alleged in your particular case? No, sir. I have no communication with Wolsey. All I know about the Wolsey company is what the record reflects. Would you think that there would be a more proper party to bring this cause of action? Well, I would be happy to represent them if they chose to do it. Thank you very much.